Next case up is ORP Surgical v. Howmedica Osteonics Corp. 22-1430, counsel. We're ready to hear you when you're ready to argue, but go ahead and fill your water. May I get water? Yes, absolutely. Good morning. Good morning. May it please the court. My name is Marcy Glenn. I represent Howmedica Osteonics, a subsidiary of Stryker, and we use the name Stryker throughout the appeal. Stryker has two primary arguments in this appeal. First that the district court committed clear error when it found that ORP did not breach the two contracts between the parties, and that Stryker did breach those contracts by not paying ORP restriction payments when the contracts terminated. And second, that the district court wrongly awarded attorney's fees to ORP. Beginning with the restriction payments, our briefs outlined the uncontroverted evidence establishing multiple breaches of both contracts. Counsel, may I interrupt you? Our review of this particular order relies so much on reviewing credibility determinations. Would you agree with that? I agree that credibility is relevant to this court's review for clear error, yes. So how do you prevail on your issues according to the standard? I guess I'm trying to figure out what are we allowed to revisit? Sure. Well, first, if I could start with the clear error standard and then address credibility. Stryker is fully aware and respectful of the deference that this court will accord district court findings. But the clear error doctrine exists for a reason, because sometimes district courts get it wrong. They have blind spots. They make subsidiary legal rulings that taint their findings. And this is that unusual case where that occurred and where we've tried to lay it out quite surgically with respect to each of the findings. We're very aware that it's highly unusual to challenge seven different findings of fact, of ultimate findings of a judge as respected as Judge Jackson. And we can't know what happened in this case and why those errors that we explain and document in our brief review. He made it pretty clear that he thought it was . . . that the testimony of your people were just not believable. It's true that Judge Jackson made those comments, but we would argue that . . . Now, what do we do with that? I mean, that's a credibility determination that we cannot make. Understood, and it deserves this court's deference. But what we've tried to emphasize, and we argued it primarily in our reply brief, is that the credibility findings arose in the context of a single issue and a single claim. And that was the claim for breach of the contract based on Stryker's alleged solicitation and diversion of the ORP representatives. On that issue, did Stryker solicit and divert? Judge Jackson undeniably found the witness's testimony not credible. But when you look at his findings of fact, and particularly if you start with the trauma contract, that's the second one that we discuss, there's not a single finding of fact that rests on a credibility determination or a lack of credibility determination. And as for the first contract, the joint contract, he does, at one point, allude to the fact that he did not believe the testimony of one Stryker witness, Mr. Jacobs. Other than that, though, there are no findings that suggest that as to the restriction payments, he didn't believe the testimony of Stryker's witnesses. And in fact, he often relies on that testimony. Well, he found that the alleged breaches were immaterial. He found that the cure period was not followed. He found, on each and every one of the allegations, a waiver in several respects. And I'm glad you raised this. And we want to go back in and re-examine each of the evidentiary findings that he made? No, it's a lot of work to review findings for clear error. I will agree to that. I don't mind the work. I know you don't. But I'd like to talk about materiality and waiver. First of all, he found only three of the seven breaches that we've discussed in the appeal to have been immaterial. And our position is that that was clear error as to each of those breaches. First, we believe that he made an error of law by inquiring into materiality at all. And the reason we take that position is that while New Jersey law does require materiality when a contract is terminated, that is not what occurred here. And New Jersey law, we submit, does not require a showing of materiality when a contract excuses performance of a particular term based on any breach. Will you suggest that the cure provision, the 10-day cure provision, can be just ignored? Well, this is a question of law. Can you answer that question? I will. The cure provision is inapplicable to the issues in this appeal. We explained that somewhat in our reply brief. But the cure provision applied to one type of termination of the contract, a termination for cause, an immediate termination. That's not what occurred here. When Stryker terminated the joint contract, it did so under a different provision where there was no right to cure. And Stryker didn't terminate the trauma contract. ORP terminated it. So even if there had been a right to cure, it wouldn't have applied there. So the right to cure issue is a non-issue in our view. If I could quickly turn to waiver, because I know that's also on Judge Kelly's mind. And understandably, Judge Jackson, in many instances, said, you waived this. You didn't bring it up right away. You tacitly consented in some fashion or another. Our point is that the contract included an anti-waiver provision, both contracts. And in response, ORP says, well, you can waive the anti-waiver provision. And in reply, we say, yes, you can waive anti-waiver provisions under New Jersey law. But that's not what happened here. New Jersey law is very clear about the standards for when a party waives an anti-waiver provision. It's a high standard. It requires a deliberate act through an agreement or a definitive conduct. What happened here is, first of all, Judge Jackson didn't apply the contract's anti-waiver provision. He didn't inquire whether there was a waiver of it under those standards of New Jersey law. That was an error of law. But even if he had, there was no evidence that would have established a waiver of the anti-waiver provision. In the sincerity matter, he thought that this was all insincere. It was post hoc rationalizations trying to justify the actions of your client. And that itself is a fact finding and a credibility finding. Generally speaking, a finding of waiver is a question of fact. Our point is that as a matter of law, there could not have been a waiver. There should never have been a waiver inquiry because of the contract's anti-waiver provision. Maybe he was doubting your sincerity that that was ever really a big deal to you either. And that nobody ever did anything about it and was happy for life to go on. It's possible, but we would say that those findings were clear error. Because if you look at the timeline, the joint contract began in August of 2018. The breaches began very quickly. Mr. Stapleford was suspended by later that, by the fall of 2018. And then the invoices were not promptly submitted. Well, first let me go back to the link stem. That was used in November of 2018. The invoices were not promptly submitted in January of 2019. And then the final act, the straw that broke the camel's back. Take the invoices for a minute. Okay. There was no damage, no harm done. It was caught up. And that was not resurrected until after the fact, as Judge Phillips suggested. The finding was that there was no harm. You can't carry on business that way. The finding was that there was no harm. The evidence was uncontroverted of harm. The evidence was that Stryker relies on timely submission of invoices for many reasons. And it didn't happen here. Stryker lost real money from the fact that these, we're calling them invoices. They're more like work orders, that they were submitted late. Stryker couldn't bill clients, customers, because of that. Stryker couldn't promptly prepare year-end reports. Quotas were able to be manipulated. And so there was uncontroverted evidence of damage from the invoices. But going back to the timeline, the final straw was in March 2019. And it's striking to us that Judge Jackson found that Stryker sat and waited on the fact that Mr. Stapleford sent these absolutely insubordinate emails and didn't act promptly on them. That was clearly erroneous. The emails were sent on March 20th and March 25th, 2019. And Stryker terminated the joint contract within days. So it's just— But those were immaterial, right? Is that what Judge Jackson thought? I don't know that Judge Jackson thought—well, yes, actually, he did find that the suspension was immaterial. And on that, once again, I have to argue clear error. When it's there, when it's staring you in the face, I realize it's not an easy argument to make. But how could it not be clear error for the top salesman for ORP to send these sorts of abusive emails and then to circulate them? It was undisputed that he then shared them with his team. How is that not failing to act in a professional manner, failing to act in good faith towards Stryker, all of which were contract requirements? Counsel, I'm interested in your point that you made earlier that the district court made subsidiary legal findings throughout the course of ruling in a very fact-bound case. What are those? Well, there was the finding about requiring materiality and making some of his findings turn on materiality. There was the findings of waiver despite the existence of the non-waiver clause. Those were the primary ones. I say that I only have four minutes left, and I haven't even talked about attorney's fees, which is the other significant issue in the case. So with the court's permission, I'd like to spend just a moment on that. Our briefs are very clear. I've heard straightforward used a couple of times this morning already, but this really is a straightforward argument. Section 18, first of all, it's an issue of law, review de novo. Section 18 of both contracts provides for indemnity. We submit that Section 18 clearly does not provide for attorney's fees in first-party claims. And if it does, if the court disagrees with that, then we submit that it is at the very worst ambiguous and that under clear New Jersey law, any ambiguity in the contract must be construed against ambiguity. Why would a third party have a right to seek damages for an injury from breach of this agreement? An example. ORP breaches the agreement by not honoring its obligations to perform in surgeries when it's assisting doctors professionally and in a commercially reasonable manner, and a patient is injured and a patient sues Stryker because it's a Stryker implant that went into the patient. And we say, wait a minute, that was ORP's responsibility. Its representatives failed to do their job under our contract with ORP. Therefore, ORP, you need to indemnify. Or on the other hand, ORP has an exclusive territory, but Stryker wrongly allows another distributor to sell products in that territory. And that other distributor sues ORP for an injunction saying, this is our territory, not yours. In that circumstance, ORP can turn to Stryker and say, you breached the contract. You owe me, you must defend this lawsuit. And we would. So I hope that answers the court's question. And with the court's permission, I'm going to reserve my last two minutes. Thank you. Thank you. Thank you. Good morning. May it please the court. My name is Todd Mayer. I represent the appellee and cross-appellants ORP Surgical and Lee Petritus. On the restriction payments, Stryker terminated the joint contract for cause. In their letter, they invoked the for cause section, section 15 of the agreement. That's how the case was litigated. Well, then they sent a second letter saying, we will make this mutual if you let us hire Mr. DeMorest. And the case was litigated as a for cause case. That's how they answered it in their answer. And so that's how the court analyzed it. When he looked at the joint contract, Judge Jackson said, no cause, no cause, no cause. He said there were no breaches. And as to a few of the things he said, and if there were any breaches, they were immaterial. Trauma contract was terminated by ORP. And then Stryker went and, under the any breaches provision, looked for these breaches after the fact. Do you agree with your friend that the ORP, sorry, that the trauma contract, our review of that, of whether there was a breach does not involve any review of credibility determinations? Of credibility determinations? No. This whole case was about credibility determinations. And the court stated in its order that its view of the evidence of the case as a whole was that Stryker's witnesses were not credible. It then went on to reiterate that point as to several witnesses, but it said flat out Stryker's witnesses were not credible. And he was not, in their brief, Stryker uses this notion that he was cabining those credibility determinations only as to the solicitation stuff. That's not correct because it actually, he, again, said they were not credible overall. But it also doesn't make any sense that he would have to, after saying that these guys are lying to me about A and B, he would have to credit their testimony as to C, D, and E against all the other evidence. So the difference between the termination for cause and the termination under the breaches wasn't really apparent to me until Stryker's reply when it made this argument that said, well, materiality only matters in termination for cause, and it doesn't matter under our breaches theory. That's not a reasonable reading of the contract, but it doesn't matter anyways because the court's findings as to materiality were on the joint contract side, on the for cause side. The court analyzed the joint contract and found no breaches, and if any, the breaches were immaterial. On the trauma side, the court analyzed the facts and the credibility, and he determined that there were no breaches, period. And those are the factual findings that Stryker is stuck with, and there is not any legal error, even if Stryker is right about this notion that if it's not for cause, you don't need materiality. And as to the trauma, those factual findings are well supported on the stocking agreements and on the Mr. Schilling's purported misconduct. The court simply found that there wasn't any evidence. There was no credible evidence as a factual matter that any of those things were breaches. On the sales of the Segway product, it found no breach because Stryker never provided a competitive product for ORP to sell. And Segway would be not a breach under two separate other provisions of the contract. Section 6.4 of the contract says that ORP has an unfettered right to sell products that are either, one, not competitive with Stryker products, or two, the sales are not contrary to Stryker's interests. There was no sale, though, right here, in this case. As to Segway? Correct. Link, they would not sell. Link, the hip stem, was being provided, was in the hospital inventory, you think, and was being provided at a doctor's request. Segway, they had a pre-existing relationship where they were selling the Segway carpal tunnel product, and then Stryker comes in and introduces one. Stryker didn't have one. Stryker introduces one. ORP says we'll sell it. Stryker never gets it to them, so they never have an opportunity to sell it. And Section 6.4 of the contract gives them an unfettered right to sell anything that's not contrary to the interests of Stryker. The court found very explicitly that they were selling this to maintain relationships with doctors on Stryker's behalf. And in their reply brief, Stryker says, no, no, don't look at Section 6.4. Look at Section 6.3. Well, Section 6.3 actually addresses the Segway scenario very directly. And it says, if we introduce a product, you know, if you're selling a product, because we don't have one, and we introduce one, we're supposed to talk, and you tell us whether you're going to start selling ours. And if you refuse to stop selling the other one, if the representative or any representative party elects not to cease marketing and selling the competitive product, Stryker Orthopedics may, in its sole discretion, exclude the new product from the products that they get to sell. That's their end. It's not a breach. They just get to say, you don't get to sell any stuff. So the court's factual findings of no breach are well-founded. And as I touched on earlier, the materiality doesn't matter argument that Stryker makes. It's not a reasonable reading of the contract in any event. They're basically saying we needed a material breach to terminate the cause and avoid the restriction payments. But we could terminate for no reason whatsoever, then go identify an immaterial breach from however far along ago, and say we get out of the restriction payments on that basis. That would read all the other reasons for getting out of the restriction payments right out of the contract, because they were all breaches as well, and it's not anything the other party would need a reasonable part of the contract. And even if they could get past the court's factual findings of no breach, and if they could get past the materiality issue, there is this issue of acquiescence. The court found that most of the conduct that's at issue here was either ignored in acquiescing, or in some cases, specifically requested by Stryker. And so they had waived most of their claims of breaches. Now they rely on this non-waiver provision. The non-waiver provision says if we ignore something, we have not waived the provision, right? You have not waived the provision that creates the breach. So the fact that they said go ahead and sell Segway doesn't mean they've waived forever and all time the non-competition provision. If we started selling Acme gauze, they could come back and say no, don't sell the Acme gauze. But they've clearly acquiesced and waived their ability to rely on the Segway sales as a breach. And even if they could get over all of those hurdles, you'd have a, you know, if the contract gave Stryker the discretion to ignore and even request immaterial breaches, and then rely on them to avoid the restriction payments that were a fundamental basis of the contract, that would violate the implied covenant of good faith and fair dealing. There would have to be a remand, consider that because the court never got there, because it simply found that there weren't any breaches. Attorney's fees. The fee provision in the contract, section 18, doesn't use the words first party or third party. Those are words that Stryker – Did Mr. Jackson find the provision ambiguous? No. He found that the clear language of the contract created first party indemnity for – Now we're dealing with New Jersey law now, correct, on the attorney fees? He would be interpreting the contract under New Jersey law, correct. He saw this language in there where it listed identify along with defend and exonerate and hold harmless. And he looked at the Bamman case out of the Third Circuit and said, yes, there's language in there that implies, based on that case, a third party scenario. But he said when you have a clear recitation of this applies to ORP, coupled just with an implication that sometimes might mean only third party, he gave favor to the clear language saying there's first party. So I don't believe he found it ambiguous. Do you recall if the provision at issue in the Third Circuit case in Daman was materially different from the one before us? Was it identical, do you know? It was – no, it was very different. It was a personal injury and property damage caused by a product defect. It had nothing to do with attorney fees. It wasn't an attorney fees case. These guys were looking for warranty coverage. They had paid out some warranties to some – they had resold some product, paid out some warranties, but there weren't any property damage or personal injury to third parties that could be used as a basis for saying it was covered by that indemnification provision. But it was an attorney's fees and it didn't have this – it did not have any breach of this contract language, which is key in this case. You heard your colleague's explanation of that language, and I've got it in front of me. Does this all come down to whether a party can be included in the language by any person or entity, if you're familiar enough with the language standing there? I think that's key. If it's not, if a party's not within the language by any person or entity, then your colleague's argument wins the day. If a party – well, I suppose, but any party, any person or entity would include any person or entity, which includes ORP. And in fact, what's interesting about this provision is it uses the word indemnify, which can have a first-party connotation, and then it uses the word any four different times. A party must indemnify for any and all loss, including attorney's fees, caused by any injury to any person or entity arising out of any breach of this agreement. So that is very broad language, and it wraps this scenario where we're seeking attorney's fees as losses caused by their breach to our any entity. So it unambiguously requires Stryker to indemnify ORP for the attorney's fees. As far as canons of construction, and I understand the one on indemnity provisions, but I never saw anyone say, and probably for good reason, I just don't know, don't we usually resolve ambiguities against the maker? Does that not apply here? We'd like it to. If it did, I mean, these are Stryker standardized contracts, I'm sure. They were drafted by Stryker, but they do contain one of those provisions that says this is a negotiated contract and so we're not going to read it against any party. So that is in there, which is why that was not raised here. Lastly, if this court was to find that Section 18 doesn't cover ORP's fees, there would need to be a remand for a consideration of fees as a sanction. Why? I'm having a lot of trouble with that argument. Because the court, the only reason the court didn't award fees as a sanction was because he was already awarding them under the contract. And he said, flatly, I would likely have ordered a defendant to reimburse plaintiffs for the attorney's fees and costs plaintiff incurred during the discovery process as a sanction for the appalling litigation misconduct. But he's saying, I'm already giving them to you. You already have them, so you had to create a different sanction. So he gave a modest additional sanction, but it was nowhere near as much as the fees, but he said, you already get the fees. So it was very clear in the record that absent the fees being awarded under the contract, some fees would have been awarded as a sanction for what he deemed appalling litigation misconduct. If I can turn in 40 seconds to the cross-appeal, one of two things happened. Either the court said diverted, and he meant diverted, in that it infers causation, but he didn't award any damages because there wasn't a good number. He couldn't figure out a way to get to what they were. That would be a legal error because he would have been required to come to some estimation on what the damages were, and Stryker provided a number. Their own expert provided evidence of a $907,000 loss to ORP from the diversion. So it's zero to $907,000? I... It wasn't a range? It was not a range? He said it was... I actually don't recall. And they argued for $907,000 in closing. I agree. Can I... Am I... Oh no, I got 16 seconds. All right. Or if it's what they say, and he was simply using diversion to mean solicitation, and they solicited, but it didn't cause any guys to go because the guys were going to go anyways, that would be erroneous as to four guys. Mr. Stolla, Mr. Fry, Mr. Miller, and Mr. Olson, because the evidence was clear that they didn't just come in when jobs got offered. Stryker had to engage in additional solicitation, which he couldn't do for still another year. That outlasted the end of the contract for a year. He wasn't supposed to solicit it, but they did. They sweetened the pot. They engaged in further negotiations with these guys. They were holding out. They gave them more money. They promised them lawyers, and then that is how they got them to kind of come over. So the notion that this sort of the whole group as a they was going to come over just because the contract was ending wasn't accurate, at least as to four people. And so we need to go back now. All right. I don't want to cut you off, but you are over time. So if you could wrap it up. Oh, all right. You really can wrap it up. Thank you very much. Thank you. I want to respond to some of the questions that were asked during my colleague's argument, starting with Judge Rossman's question. We believe Judge Jackson clearly found the contract ambiguous. He said it was self-contradictory, internally inconsistent, and that both parties have proffered reasonable constructions of Section 18 on attorney's fees. And that is the definition of ambiguity under New Jersey law. What I recollect him saying is that just because the language says what it says doesn't mean it can't be both first party and third party, and then relying on certain provisions to say this supports first, this supports third, you're in the door. Right. And we think that that is, he didn't use the word ambiguous, but we think that he found it was ambiguous. Second, I think that you asked about whether the provision in the Daman case was materially different from the provision in this case, and counsel responded about differences in the case itself. The provision was very similar. It had the same defend, exonerate, hold harmless language that we have in this provision in Section 18, and that was the basis for the decision in Daman. This contract is different, though, from Daman in that we also have the ancillary language, what we've called the ancillary language in Section 18, that further supports the argument that that section is limited to third party claims. And most, for me, the most important thing, which wasn't in Daman, or at least not discussed, is Section 17, a completely separate section which precedes Section 18, which is entitled remedies. Now, the contract says you don't attach any significance to the titles, but it also uses the word remedies in the text of Section 17. It begins by stating the party's right to seek injunctive relief. Shall I stop or continue? You can go a minute and a half. Thank you. Because opposing counsel did. In the event of breach, they may seek an injunction. It ends with this sentence. The non-breaching party may seek any and all other such actions and remedies available to it under law or in equity to enforce this agreement. This is the section that covers ORP's remedies for a breach of contract, the remedies available to it to enforce this agreement.  Counsel, who is the person in the indemnification provision, the word person, any person? Any person or entity we believe is any third party person or entity. If the parties had wanted it to be ORP or striker, they would have said any person or entity, including either party to this agreement. They didn't say that. But it's not merely that. It's also the hold harmless, exonerate, and defend language that makes it clear that Section 18 doesn't apply. It's an awfully broad term, though, any person or entity. Any is a broad term, but it's not defining the duty. OK. I cut in on you, and I shouldn't have, because I know you want one more point. That's OK. We addressed that in our reply, so I'll just move on. I want to respond to your question. I think it was your question, Judge Phillips, about construing Section 18 against the drafter. And I just want to point out Section 28 of the contract, which expressly provides that the contract was negotiated. And it should not be subject to that rule of construction. I have another minute and a half. I'd like to keep going. I think I will. I think you're actually over time. Oh, I'm in the red. OK. Well, thank you so much for indulging me. Thank you very much, counsel. The case is submitted, and counsel are excused.